UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
                                     )
SANJIVKUMAR NARHARIBHAI PATEL,       )
                                     )
                 Plaintiff,          )
                                     )      CIVIL ACTION
          v.                         )      NO. 12-12317-WGY
                                     )
JEH JOHNSON, Secretary of the        )
United States Department of          )
Homeland Security, ERIC HOLDER,      )
JR., United States Attorney          )
General, UNITED STATES               )
CITIZENSHIP AND IMMIGRATION          )
SERVICES, and UNITED STATES          )
CITIZENSHIP AND IMMIGRATION          )
SERVICES ADMINISTRATIVE APPEALS      )
OFFICE,[1]                           )
                                     )
                 Defendants.         )
———————————————————————— )


MEMORANDUM AND ORDER

YOUNG, D.J.                                   March 11, 2014


     **"Give me your tired, your poor,**
     **Your huddled masses yearning to breathe free."**

          Inscription on the Statute of Liberty[2]

     Well, not quite.  Today it might read, "Give us your

educated, skilled laborers willing to work at jobs Americans

---

[1]  Janet Napolitano, the former Secretary of the United
States Department of Homeland Security, was originally named a
defendant in this action.  Because Secretary Napolitano has been
succeeded in office since this action's initial filing, her
successor, Secretary Jeh Johnson, is substituted in the caption.
See Fed. R. Civ. P. 25(d).

[2]  Emma Lazarus, The New Colossus (1883).

either won't or can't do.  If the jobs dry up, we'll tell you to go home."

This case plumbs the labyrinthine bureaucracy we have created to effectuate the current policy.

I.   **INTRODUCTION**

In this case, Sanjivkumar Narharibhai Patel ("Patel") challenges the revocation of his I-140 immigration petition by the United States Citizenship and Immigration Services.  After careful review of the administrative record, this Court holds that the agency's revocation of the petition was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  It therefore AFFIRMS the agency's decision.

A.   **Procedural History**

On December 13, 2012, Bombay Mahal Restaurant, Inc. ("Bombay Mahal") and Patel filed a complaint against Janet Napolitano, then-Secretary of the United States Department of Homeland Security, Eric Holder, Jr., United States Attorney General, the United States Citizenship and Immigration Services, and the United States Citizenship and Immigration Services Administrative Appeals Office (collectively, the "Government").  Pls.' Original Compl. Writ Mandamus, Declaratory J. & Injunctive Relief ("Compl."), ECF No. 1.  On April 11, 2013, the Government moved to dismiss the complaint for lack of subject-matter

jurisdiction.  Defs.' Rule 12(b)(1) Mot. Dismiss Lack Subject
Matter Jurisdiction, ECF No. 14.  Bombay Mahal and Patel filed
an opposition on May 13, 2013.  Pls.' Mem. Opp'n Defs.' Mot.
Dismiss, ECF No. 19.  The Court held a motion session on June 3,
2013, at which time it granted the motion as to Bombay Mahal.
Elec. Clerk's Notes, June 3, 2013, ECF No. 21.

The Government moved for summary judgment against the
remaining plaintiff, Patel, on August 1, 2013.  Defs.' Mot.
Summ. J. Sanjivkumar Narharibhai Patel's Claims, ECF No. 22; see
also Defs.' Mem. Supp. Mot. Summ. J. Sanjivkumar Narharibhai
Patel's Claims ("Defs.' Mem."), ECF No. 23.  Patel filed his
opposition, along with a cross-motion for summary judgment, on
October 2, 2013.  Pl.'s Opp'n Defs.' Mot. Summ. J. & Cross-Mot.
Summ. J., ECF No. 32; see also Pls.' Mem. Opp'n Defs.' Mot.
Summ. J. & Supp. Cross-Mot. Summ. J. ("Pls.' Mem."), ECF No. 33.
The Government filed a memorandum opposing Patel's cross-motion
for summary judgment on November 7, 2013.  Defs.' Opp'n Pl.'s
Cross Mot. Summ. J. Sanjivkumar Narharibhai Patel's Claims
("Defs.' Opp'n"), ECF No. 38.

**B.   Statutory and Regulatory Background**

To regulate immigration into this country, the Immigration
and Naturalization Act (the "Act") establishes a series of
procedures by which the Government may grant permanent residency
status to aliens who meet certain statutory criteria.  See,

e.g., 8 U.S.C. § 1154 (procedures for granting immigrant

status); 8 U.S.C. § 1255 (procedures for granting permanent

resident status).  One path to lawful immigration status

allocates visas based upon the employment qualifications of the

applicant.[3]  See 8 U.S.C. § 1153(b).  For visas given to skilled

workers, as is relevant in this case, the Act sets out a multi-

agency, tripartite scheme governing how such documents are

issued.

---

[3] Employment-based immigrant visas are allocated in groups. No more than 28.6 percent of visas may go to "[p]riority workers," which includes (a) "aliens with extraordinary ability," (b) "[o]utstanding professors and researchers," and (c) "[c]ertain multinational executives and managers." 8 U.S.C. § 1153(b)(1). Another 28.6 percent of visas are allocated to aliens who are "members of the professions holding advanced degrees or aliens of exceptional ability." Id. § 1153(b)(2). A third set of visas, again totaling no more than 28.6 percent of all visas, goes to "skilled workers, professionals, and other workers." Id. § 1153(b)(3). Skilled workers are defined as "[q]ualified immigrants who are capable, at the time of petitioning for classification . . ., of performing skilled labor (requiring at least 2 years training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States." Id. § 1153(b)(3)(A)(i). Another 7.1 percent of visas may go to certain qualifying special immigrants. Id. § 1153(b)(4). Finally, the remaining 7.1 percent of visas may go "to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise." Id. § 1153(b)(5)(A). Currently, the total worldwide number of employment-based visas that may be issued is capped at 140,000, plus "the difference (if any) between the maximum number of visas which may be issued under section 1153(a) of this title (relating to family-sponsored immigrants) during the previous fiscal year and the number of visas issued under that section during that year." Id. §§ 1151(d)(1), 1151(d)(2)(C).

First, an alien must have a prospective employer in the United States, and that employer must then petition the Department of Labor, via a Form ETA-750,[4] to issue a labor certificate.  See 8 U.S.C. § 1153(b)(3)(C); Masih v. Mukasey, 536 F.3d 370, 373 (5th Cir. 2008).  This certificate memorializes the Department's determination that (a) "there are not sufficient workers who are able, willing, qualified . . . and available at the time of application . . . to perform such . . . labor," and that (b) "the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1182(a)(5)(A)(i).

Next, the employer may file an immigrant worker visa petition (called a Form I-140) with the United States Citizenship and Immigration Services (the "USCIS").  Pai v. United States Citizenship & Immigration Servs., 810 F. Supp. 2d 102, 104 (D.D.C. 2011).  This petition includes a series of documentation requirements to establish that the worker does, in fact, fall within one of the employment-based categories established by the Act.  See 8 C.F.R. § 204.5.  The petitioner

---

[4] As part of the petition process, the employer applicant must file a Form ETA-750 with the Department of Labor.  United States v. Ryan-Webster, 353 F.3d 353, 356 (4th Cir. 2003).  This form "identifies the job opportunity and the employer's minimum job requirements."  Regal Int'l., Inc. v. Napolitano, No. 10 C 5347, 2011 WL 4538690, at *1 (N.D. Ill. Sept. 29, 2011).

bears the burden of proof by a preponderance of the evidence. See 8 U.S.C. § 1361; see also Matthews v. United States Citizenship & Immigration Servs., 458 F. App'x. 831, 833 (11th Cir. 2012).  If approved, the petition will be forwarded to the Department of State for the allotment of a visa number.[5]  Ryan-Webster, 353 F.3d at 356.  If the petition is not approved, the employer may appeal the decision to the USCIS Administrative Appeals Office (the "AAO").  See 8 C.F.R. § 103.3(a)(1)(ii).

Petition approval is not, however, irreversible.  First, petitions may be revoked for cause, as "[t]he Secretary of Homeland Security[6] may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him."  8 U.S.C. § 1155.  "Good and sufficient cause" includes any situation where "the evidence of record at the time the decision was issued . . . warranted . . . a denial" of the petition.  Matter of Estime, 19 I. & N. Dec. 450, 452 (BIA 1987); see also Love Korean Church v. Chertoff, 549 F.3d 749, 754 n.3 (9th Cir. 2008) (holding that the Estime standard is a reasonable interpretation of 8 U.S.C. section 1155 and applying

---

[5] After the I-140 petition is granted, the alien may file a Form I-485 application to adjust her status to a legal permanent resident.  8 U.S.C. § 1255(i); see also Pai, 810 F. Supp. 2d at 104-05.  If that application is approved, the alien is then eligible for her green card, thus concluding the immigration status adjustment process.  See Ryan-Webster, 353 F.3d at 356.

[6] The Secretary has delegated his revocation authority to any USCIS officer authorized to approve an employment-based petition.  8 C.F.R. § 205.2(a).

that standard to its review of agency's revocation decision).

Before a petition can be revoked, however, the USCIS must

provide notice of an intent to revoke to the petitioner, who

must then "be given the opportunity to offer evidence in support

of the petition . . . and in opposition to the grounds alleged

for revocation of the approval."  8 C.F.R. § 205.2(b).  Adverse

decisions can be appealed to the AAO.  See id. § 205.2(d).

Second, under certain conditions, a petition can be

automatically revoked.  For the purposes of the case at bar, the

most relevant condition is that which automatically revokes the

petition "[u]pon termination of the employer's business in an

employment-based preference case." Id. § 205.1(a)(3)(iii)(D).

After the petition has been revoked, the USCIS must send notice

to the petitioner's last known address.  Id. § 205.1(b).

   C.   Facts

In November 2003, Bombay Mahal filed a Form ETA-750,

requesting that the Department of Labor certify an "Indian

[s]pecialty [cook]" position under 8 U.S.C. section 1153.

Certified Administrative Record[7] ("AR") 298.  On the form, Bombay

Mahal stated that a minimum of two years of experience was

required for the job, and that an employee in that role would

"[p]repare all types of Indian specialty dishes."  Id.  One

---

[7] The Certified Administrative Record was provided under
seal to the Court.  See Elec. Order, Aug. 5, 2013, ECF No. 27.

month later, in December 2003, Bombay Mahal filed an I-140
petition hire Patel for the position.  Id. at 262.  Concurrent
with the I-140 petition submission, Patel filed an I-485
application to adjust his status to that of a permanent
resident.  Id. at 6-9.

The USCIS initially denied the I-140 petition on September
14, 2004, stating that Bombay Mahal had not demonstrated an
"ability to pay the proffered wages," as required by 8 C.F.R.
section 204.5(g).  Id. at 295.  After Bombay Mahal filed
additional documentation, the USCIS approved its petition on
November 16, 2004.  Id. at 33.  Patel then worked for Bombay
Mahal from June 2004 through November 2008; his employment ended
because the restaurant closed on December 31, 2008.  Id. at 144.
On February 15, 2009, Patel was hired to work as an Indian
specialty cook at the Bollywood Cafe.  Id. at 143.

### 1.   Revocation and the Initial Appeals Process

At the same time as Patel found a new job, the USCIS began
procedures to revoke his I-140 petition.  It issued a Notice of
Intent to Revoke on February 18, 2009, questioning Patel's
qualifications, allegedly fraudulent materials submitted by
Patel's then-lawyer, and Bombay Mahal's compliance with
Department of Labor job advertising and recruiting requirements.
Id. at 258-59.  Bombay Mahal and Patel responded on March 10,
2009, and included letters of reference from Patel's current and

previous employers, as well as documentation relating to Bombay Mahal's advertising practices.  Id. at 213-29.  The USCIS judged this documentation inadequate and issued a Notice of Revocation on August 5, 2009.  Id. at 256-60.

Bombay Mahal and Patel administratively appealed.  Id. at 247.  In a memorandum filed on October 6, 2009, they argued that the USCIS improperly had presumed that because materials filed by Patel's then-lawyer in other cases had been fraudulent, the materials in Patel's case were therefore fraudulent, even though there was no direct evidence of fraud in the instant case.  Id. at 129-31.  They also criticized the USCIS's handling of the labor certification and recruitment procedures, and argued that the USCIS failed objectively to consider evidence of Patel's work experience.  Id. at 132-35.

The USCIS took no action for the next three years, and on November 1, 2012, it issued a Notice of Intent to Dismiss and Derogatory Information.  Id. at 193.  The agency reported that Bombay Mahal "was dissolved on March 2, 2010," and "[i]f [the] organization is no longer in business, then no bona fide job offer exists, and the petition and appeal are therefore moot." Id.  In response, Patel and Bombay Mahal stated that they had informed the USCIS that the restaurant had closed in their 2009 memorandum.  Id. at 118.  They also cited to Betancur v. Roark, No. 10-11131-RWZ, 2012 WL 4862774 (D. Mass. Oct. 15, 2012)

(Zobel, J.), which held that because the employee in that case was eligible for job portability under 8 U.S.C. section 1154(j), the visa could not automatically be revoked. AR 118-19 (citing Betancur, 2012 WL 4862774, at *8.).

The USCIS replied to this submission with a Request for Evidence, issued on January 10, 2013, in which it disagreed with Patel and Bombay Mahal's interpretation of the job portability provision. Id. at 110-13. Relying in part on the Ninth Circuit's decision in Herrera v. United States Citizenship & Immigration Servs., 571 F.3d 881 (9th Cir. 2009), the agency concluded that 8 U.S.C. section 1154(j) requires the petition to "remain valid" at the time the employee changes jobs, but because Bombay Mahal had closed (thus invalidating the petition) before Patel changed jobs, he was not eligible for job portability. AR 110-11. The USCIS further pointed to evidence indicating that Bombay Mahal also had filed sixteen Form I-140 petitions on behalf of other beneficiaries, and requesting tax records demonstrating the restaurant's "continuing ability to pay the combined proffered wages to each beneficiary." Id. at 112 (citing Matter of Great Wall, 16 I. & N. Dec. 142, 144-45 (BIA 1977)). Bombay Mahal and Patel responded by sending Patel's individual tax records from 2004 through 2012 and corporate tax records for Bombay Mahal from 2003 through 2008. Id. at 46.

## 2.    The Administrative Appeals Office Decision

On March 20, 2013, the AAO dismissed the appeal.  See id. at 32-45.  Before addressing the substance, the AAO first concluded that the USCIS's 2009 notice was not sufficiently specific as per 8 C.F.R. sections 103.2(b)(16) and 205.2.  Id. at 34-36.  The AAO thus withdrew the agency's initial decision. Id. at 36.  It did, however, conclude that "the approval of [Bombay Mahal] may not be reinstated, as the record does not establish that the petition was approvable when filed, or that [Patel] ported off of an approved petition pursuant to [8 U.S.C. section 1154(j)]."  Id.

First, the AAO held that Bombay Mahal's I-140 petition was automatically revoked because the business had closed in late 2008, and Patel did not port to new employment until 2009.  Id. at 37, 39.  The AAO also held that Patel and Bombay Mahal had been given proper notice of this ground in January 2013 and had been provided an opportunity to submit evidence that a bona fide job offer existed at the time the restaurant closed.  Id. at 38-39.

Second, the AAO held that the petition was invalid at the time of its filing, because Bombay Mahal had not demonstrated the ability to pay the proffered wage to Patel, nor could it show such capacities for the other I-140 beneficiaries working at Bombay Mahal.  See id. at 39-41.  After reviewing the

11

submitted tax documentation, it concluded that "[w]hile the net income in 2003 was sufficient to pay the proffered wage to [Patel in] that year, it is not sufficient to pay all the sponsored workers, including the 13 for whom Form I-140 petitions were pending in 2003." Id. at 42.

Third, the AAO found that the "record does not support [Bombay Mahal]'s contention that [Patel] had the requisite work experience in the job offered." Id. at 45.  It examined two letters of employment verification provided to the agency, but concluded that neither letter satisfied the requirements of 8 C.F.R. sections 204.5(g) or (l)(3)(ii)(A), and thus the agency "had good and sufficient cause to revoke the approval of the petition."[8]  Id.

## II.  ANALYSIS

### A.   Standard of Review

Under the Administrative Procedure Act (the "APA"), a district court may review an agency's final decision, which for these purposes is the AAO's March 2013 ruling.  5 U.S.C. § 704; see also Herrera, 571 F.3d at 885 (holding that AAO decision is final for APA purposes).  The APA does not provide for de novo

---

[8] The AAO also held that the agency improperly found that Bombay Mahal did not comply with the recruitment procedures specified under the Act, see AR 42-43, and that the agency's "finding of fraud or willful misrepresentation against [Bombay Mahal] was arbitrary," id. at 43; see id. at 43-45.  It thus vacated those portions of the initial opinion.  Id. at 45.

review, but instead specifies that a court may only "hold
unlawful and set aside agency action, findings, and conclusions
found to be . . . arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> An agency [determination] is arbitrary and capricious
> if the agency lacks a rational basis for adopting it –
> for example, if the agency relied on improper factors,
> failed to consider pertinent aspects of the problem,
> offered a rationale contradicting the evidence before
> it, or reached a conclusion so implausible that it
> cannot be attributed to a difference of opinion or the
> application of agency expertise.

Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109
(1st Cir. 1997) (citing Motor Vehicle Mfrs. Ass'n v. State Farm
Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Such review is "narrow" and "highly deferential," and so
long as the court determines that "the agency's decision is
supported by a rational basis," it must affirm, "even if it
disagrees with the agency's conclusions." River St. Donuts, LLC
v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009); see also
Carcieri v. Kempthorne, 497 F.3d 15, 43 (1st Cir. 2007) (holding
that agency actions are presumed to be valid), rev'd on other
grounds sub nom., Carcieri v. Salazar, 555 U.S. 379 (2009).

Finally, at the summary judgment stage, "the district judge
sits as an appellate tribunal," and "[t]he 'entire case' on
review is a question of law." American Bioscience, Inc. v.
Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001). In so doing,

the court considers "the full administrative record that was before the [agency] at the time [it] made [its] decision." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), abrogated by Califano v. Sanders, 430 U.S. 99 (1977); see also Olsen v. United States, 414 F.3d 144, 155 (1st Cir. 2005) (observing that the district court may supplement the administrative record only under limited circumstances where plaintiff has demonstrated that the agency has acted in bad faith or has tried to frustrate judicial review).

**B.   Subject-Matter Jurisdiction**

Before reaching the merits, this Court first must determine whether it has subject-matter jurisdiction to hear this claim. Two statutes control the issue.

First, Congress has limited the ability of the federal courts to review discretionary immigration decisions.  It has determined that "no court shall have jurisdiction to review . . . [any decision of the Secretary of Homeland Security] the authority for which is specified under this subchapter to be in the discretion of the . . . Secretary of Homeland Security."  8 U.S.C. § 1252(a)(2)(B)(ii).  Second, when determining whether to revoke visa petitions, "[t]he Secretary of Homeland Security may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title."  Id. § 1155.  The question for this

Court, then, is whether the language of section 1155 is sufficiently expansive to qualify as "discretionary," and thus non-reviewable, under section 1252.

Federal courts have not settled on an answer to this question.  A majority of circuits have concluded that section 1155 is a non-reviewable discretionary decision.[9]  In explaining their determinations, these courts first highlight the words "may" and "at any time," and conclude that they are "permissive" words that "plainly signif[y] a discretionary decision."  El-Khader v. Monica, 366 F.3d 562, 567 (7th Cir. 2004).  Second, they focus on the statutory language "for what [the Secretary] deems to be good and sufficient cause," concluding both that the word "deems" commits the decision to the judgment of the Secretary, and that the standard itself is "highly subjective" and thus provides an insufficiently precise standard to be considered judicially manageable.  Id. at 567-68; see also Jilin

_____

[9] See Mehanna v. United States Citizenship & Immigration Servs., 677 F.3d 312, 313 (6th Cir. 2012); Green v. Napolitano, 627 F.3d 1341, 1344-45 (10th Cir. 2010); Abdelwahab v. Frazier, 578 F.3d 817, 821 (8th Cir. 2009); Sands v. United States Dep't of Homeland Sec., 308 F. App'x. 418, 419-20 (11th Cir. 2009); Ghanem v. Upchurch, 481 F.3d 222, 224 (5th Cir. 2007); Jilin Pharm. USA, Inc., v. Chertoff, 447 F.3d 196, 205 (3d Cir. 2006). The Second Circuit has concluded that the substantive decision to revoke a petition is "committed to the discretion of the Attorney General," but that the court retains jurisdiction to determine whether mandatory notice requirements associated with that revocation have been met.  Firstland Int'l, Inc. v. United States Immigration & Naturalization Serv., 377 F.3d 127, 130-31 (2d Cir. 2004).

Pharm. USA, Inc. v. Chertoff, 447 F.3d 196, 204-05 (3d Cir. 2006) ("Here, the requirement of 'for what [the Secretary] deems good and sufficient cause' in [section] 1155 is so vague as to be useless as a guide to a reviewing court.") (first alteration in original).

The Ninth Circuit has taken an opposite tack and determined that there is jurisdiction. In ANA International, Inc. v. Way, 393 F.3d 886 (9th Cir. 2004), it recognized that the language "'may, at any time, for what he deems to be' . . . plainly authorizes some measure of discretion." Id. at 893. The court concluded, however, that the words "good and sufficient cause" are not without meaning, but rather "refer[] to a meaningful standard that the [Secretary of Homeland Security] may 'deem' applicable or inapplicable in a particular case, but which he does not manufacture anew in every new instance." Id. at 894. Thus, it concluded, the courts retain jurisdiction. In dissent, Judge Tallman rejected this view, concluding that a "common sense reading of the language" of the statute "provides that the [Secretary of Homeland Security] gets to decide whether and when to act for whatever reasons he alone believes are good and sufficient." Id. at 896-97 (Tallman, J., dissenting). He also rejected the view that Congress ought be required to "recite the words 'sole and unreviewable discretion' as some sort of

talismanic incantation" in order to make an executive function discretionary.  Id. at 898.

The First Circuit has yet to reach this issue, and there is an intra-circuit split among the district courts about whether they retain jurisdiction.  Compare Magalhaes v. Napolitano, 941 F. Supp. 2d 150, 152-53 (D. Mass. 2013) (Gorton, J.) (holding that court had no jurisdiction to review visa revocation decision), with Betancur v. Roark, No. 10-cv-11131-RWZ, slip op. at 3 (D. Mass. Aug. 19, 2011) (Gertner, J.) (holding that court has jurisdiction to review visa revocation decision).

This Court, on balance, concludes that the arguments that section 1155 commits the revocation decision to the discretion of the agency are more persuasive.  Because this is a close question, however, engendering both an inter-circuit and intra-circuit split, this Court will proceed to analyze the merits of the complaint.  See, e.g., Seale v. Immigration & Naturalization Serv., 323 F.3d 150, 156 (1st Cir. 2003) (allowing court to adjudicate merits before addressing question of statutory standing); Sierra Club v. Robertson, 28 F.3d 753, 760 (8th Cir. 1994) (acknowledging that "the standing issue presents a close question," and thus "for the sake of completeness and efficiency" addressing the merits of the challenge).

**C.   Automatic Revocation**

17

The AAO's first justification for revoking Patel's I-140 petition is that "approval of the petition was automatically revoked under 8 C.F.R. [section] 205.1(a)(3)(iii)(D) upon the termination of the petitioner's business in November 2008."  AR 39; see also Defs.' Mem. 10.  This Court agrees.

The regulations governing the Act provide, in relevant part, that the approval of an I-140 petition like Patel's automatically is revoked "[u]pon termination of the employer's business in an employment-based preference case under [8 U.S.C. sections 1154(b)(1)(B), 1154(b)(1)(C), 1154(b)(2), or 1154(b)(3)]." 8 C.F.R. § 205.1(a)(3)(iii)(D).  The USCIS has determined that a business is terminated for the purposes of this section when it is no longer an active business.  See, e.g., [Identifying Information Redacted By Agency], 2013 WL 4775251, at *2 (AAO Mar. 28, 2013) (automatic revocation triggered when petition has "gone out of business"); [Identifying Information Redacted By Agency], 2012 WL 8501708, at *1 (AAO Apr. 26, 2012) (no active business when business is reported closed); [Identifying Information Redacted by Agency], 2012 WL 4713199, at *1 (AAO Apr. 5, 2012) (no active business when petitioning company had been closed).

In the instant case, Bombay Mahal reported in a letter attached as part of Patel's appeal that the "business officially

closed on [December 31, 2008]."[10]  AR 144.  Under the plain text
of the regulation, then, because Bombay Mahal closed by the end
of 2008, and therefore ceased to become an active business at
that time, Patel's petition was automatically revoked as of
December 31, 2008.[11]

In response, Patel points to 8 U.S.C. section 1154(j)'s
"porting" provision and argues that because he changed jobs, the
USCIS is prevented from automatically revoking his petition.
See Pls.' Mem. 17.  That provision states:

> A petition under subsection (a)(1)(D)[12] of this section
> for an individual whose application for adjustment of
> status pursuant to section 1255 of this title has been
> filed and remained unadjudicated for 180 days or more
> shall remain valid with respect to a new job if the
> individual changes jobs or employers if the new job is

---

[10] In the memorandum accompanying the 2009 appeal, Patel
reports that the business closed in November 2008.  AR 200.
Whether the business closed in November or December 2008,
however, is immaterial for the purpose of this analysis.

[11] The date that the restaurant ceased to be "active" is
different from the date the business was "dissolved," and per
the Commonwealth of Massachusetts, Corporations Division, Bombay
Mahal was dissolved on March 2, 2010.  AR 120.  Patel does not
argue that "termination" under the regulation requires that the
business be dissolved, as opposed to it being no longer active.
In any event, as an agency's interpretation of its own
regulation, the USCIS's construction is to be affirmed unless it
is "plainly erroneous or inconsistent with the regulation," Auer
v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v.
Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)), and
in this case, the interpretation is neither.

[12] This numbering appears to be a scrivener's error and
should refer to subsection (a)(1)(F).  See Herrera, 571 F.3d at
886 n.5.

in the same or a similar occupational classification
as the job for which the petition was filed.

8 U.S.C. § 1154(j) (emphasis added).  This provision, however,

provides Patel no comfort.

This Court is not the first entity to interpret this

statutory language, and here it steps upon ground already

trodden.  In Matter of Al Wazzan, the AAO construed this

provision and held in a precedential decision that "the petition

must be 'valid' to begin with if it is to 'remain valid with

respect to a new job.'"  25 I. & N. Dec. 359, 365 (AAO 2010)

(quoting 8 U.S.C. § 1154(j)).  The AAO further went on to define

a "valid" petition as one to which the applicant is "entitled."

Id. at 367.

In considering the agency's construction in Al Wazzan, the

Court must first answer a prerequisite question regarding the

degree of deference that ought be accorded to this

interpretation: the highly deferential standard set out in

Chevron, U.S.A., Inc. v. National Resources Defense Council,

Inc., 467 U.S. 837, 842-43 (1984), where an agency

interpretation is adopted so long as it is a "permissible

construction of the statute," or the less deferential standard

of Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), where the

agency is given only the deference warranted by its "power to

persuade."

The First Circuit, in interpreting the Supreme Court's opinion in <u>United States</u> v. <u>Mead Corp.</u>, 533 U.S. 218 (2001), has determined that the primary consideration governing the type of deference that ought apply is whether the interpretation was intended "to carry the force of law," and a major indicator of that intention is whether the decision was precedential and published.  <u>River St. Donuts</u>, 558 F.3d at 115-116 (holding that an unpublished, non-precedential AAO decision ought be given <u>Skidmore</u> deference).

<u>Al Wazzan</u> is a published, precedential decision, 25 I. & N. Dec. at 359 n.1, which has the force of law and is binding on the agency, 8 C.F.R. § 103.3(c).  Thus, it ought be given <u>Chevron</u> deference.  <u>See</u> <u>River St. Donuts</u>, 558 F.3d at 116; <u>see also</u> <u>Garcia-Quintero</u> v. <u>Gonzales</u>, 455 F.3d 1006, 1012 (9th Cir. 2006) ("[T]he 'essential factor' in determining whether an agency action warrants <u>Chevron</u> deference is its precedential value.").  Applying <u>Chevron</u>, the AAO's construction is a reasonable interpretation of an ambiguous statutory provision, and thus ought be adopted.  <u>See</u> <u>Herrera</u>, 571 F.3d at 888 (adopting the AAO's "cogent analysis" in <u>Al Wazzan</u>).[13]

---

[13] <u>Herrera</u> was referring to an unpublished version of <u>Al Wazzan</u>, which was issued by the AAO in 2005.  <u>Herrera</u>, 571 F.3d at 888; <u>Al Wazzan</u> 25 I. & N. Dec. at 359 n.1.  <u>Al Wazzan</u> was later republished as a precedential opinion in 2010.  25 I. & N. Dec. at 359 n.1.

In the instant case, the AAO expanded slightly upon its Al Wazzan interpretation in its March 2013 opinion.  It concluded that:

> A plain reading of the phrase "will remain valid" suggests that the petition must be valid prior to any consideration of whether or not the adjustment application was pending more than 180 days and/or the new position is [the] same or similar.
> In other words, it is not possible for a petition to remain valid if it is not valid currently.

AR 37.  While the AAO's non-precedential opinion is not entitled to Chevron deference, it may claim deference under Skidmore. Skidmore determines deference based upon a "sliding-scale approach under which the degree of deference accorded to an agency interpretation hinges on a variety of factors, such as 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of its interpretation] with earlier and later pronouncements." Doe v. Leavitt, 552 F.3d 75, 81 (1st Cir. 2009) (quoting Skidmore, 323 U.S. at 140) (alterations in original).  In applying Skidmore, the First Circuit has further distilled these factors into "thoroughness, formality, validity, consistency, and agency expertise." Id. at 81 (citing Kristin E. Hickman & Matthew D. Krueger, In Search of the Modern Skidmore Standard, 107 Colum. L. Rev. 1235, 1259 (2007)).

These factors cut in favor of granting the AAO considerable deference.  Turning first to thoroughness, as part of its

analysis, the agency "highlighted relevant portions of both the statutory scheme and its legislative history," as well as other on-point judicial precedent.  The appropriate use of these sources is a consideration in determining whether the "interpretation was a product of through consideration." Id. at 82 (citing Western Union Tel. Co. v. Fed. Commc'n Comm'n, 665 F.2d 1126, 1143 (D.C. Cir. 1981)).  Moreover, the agency's interpretation was first promulgated in its January 2013 Request for Evidence, see AR 110-11, and Patel had an opportunity to respond to that construction in writing, see AR 46-47.  This is the type of "open exchange" between parties that the First Circuit has termed a "badge of thoroughness." Doe, 552 F.3d at 82 (citing Rubie's Costume Co. v. United States, 337 F.3d 1350, 1356 (Fed. Cir. 2003)).  Second, while this interpretation lacks the force of law, it was not a mere casual construction, but rather was the product of a multilayered intra-agency appellate process involving relatively formal procedures.  See 8 C.F.R. § 103.3 (discussing AAO procedures).

Third, "[t]he 'validity' element of Skidmore analysis draws . . . attention to whether an agency pronouncement is well-reasoned, substantiated, and logical." De La Mota v. United States Dep't. of Educ., 412 F.3d 71, 80 (2d Cir. 2005).  Here, the agency appropriately and reasonably built its interpretation upon the gloss that Al Wazzan gave to "will remain valid."  The

AAO's interpretation of the phrase to mean that "it is not possible for a petition to remain valid if it is not valid currently," AR 38, is logically consistent with Al Wazzan's interpretation of "remain valid" to mean that the petition must be valid "to begin with."  Al Wazzan, 25 I. & N. Dec. at 365. Moreover, the AAO engaged with the purpose of the statute in a thoughtful and logical manner by examining the regulatory context at the time the statute was written, while also considering the Ninth Circuit's interpretation of the same language in Herrera.  See AR 37.  Such factors cut in favor of a determination that the interpretation was valid.  See Doe, 552 F.3d at 82 (considering whether agency "made good use of available interpretive resources" to determine validity).

Fourth, with respect to consistency, as discussed above, the agency's interpretation is consistent with the approach taken in Al Wazzan, and there is no evidence that USCIS has taken a different interpretive tack since it began enforcing the porting provision.  Finally, turning to agency expertise, the USCIS is the agency charged with interpreting this statute, and it does so on a "proactive day-to-day" basis, which cuts in favor of deference.  In re New Times Sec. Servs., Inc., 371 F.3d 68, 82 (2d Cir. 2004).

Thus, for the aforementioned reasons, because the AAO's interpretation is worthy of deference, this Court adopts the

24

agency's construction of the term "will remain valid" to mean that "the petition must be valid prior to any consideration of whether or not" the rest of the portability provision applies. AR 37.

Turning back to the facts of the case, because Bombay Mahal ceased being an active business in December 2008, Patel's petition was automatically terminated at that time.  Therefore, when he moved to a new job at Bollywood Cafe in February 2009, he had no valid petition to port, even though he satisfied all of the other additional statutory criteria.[14]  Thus, the agency properly revoked his petition under 8 C.F.R. section 205.1(a)(3)(iii)(D).

D.    **For-Cause Termination**

In addition to the automatic revocation grounds discussed above, the AAO justified terminating Patel's petition on two additional, independent for-cause grounds: that Bombay Mahal lacked the ability to pay the proffered wage to all its I-140 beneficiary-employees, and that Patel did not provide sufficient evidence of his employment training and experience.

In the precedential decision, Matter of Estime, 19 I. & N. Dec. 450 (BIA 1987), the agency held that it may revoke a

---

[14] There is no dispute that Patel's petition had been pending for more than 180 days, that he had changed employers, and that his new job was in the same or similar occupation classification as his original job.

petition if the "evidence of record at the time the decision was
issued . . . warranted such a denial." Id. at 452.  The Ninth
Circuit has held that this is a "reasonabl[e] interpret[ation]"
of the agency's revocation authority, and thus ought be given
Chevron deference.  Love Korean Church v. Chertoff, 549 F.3d
749, 754 n.3 (9th Cir. 2008).  This Court agrees.  It thus
reviews the AAO's decision in the instant case for compliance
with that substantive requirement, and, as required by the APA,
applies an arbitrary and capricious standard of review.

### 1.    Ability to Pay Proffered Wage

An employer filing an I-140 petition on behalf of an
immigrant employee must have the ability to pay that worker.
The relevant regulatory provision states:

> Any petition filed by or for an employment-based
> immigrant which requires an offer of employment must
> be accompanied by evidence that the prospective United
> States employer has the ability to pay the proffered
> wage.  The petitioner must demonstrate this ability at
> the time the priority date is established and
> continuing until the beneficiary obtains lawful
> permanent residence.  Evidence of this ability shall
> be either in the form of copies of annual reports,
> federal tax returns, or audited financial statements.

8 C.F.R. § 204.5(g)(2).  This obligation is not limited only to
the specific petition at issue, and the agency cites to Matter
of Great Wall, 16. I. & N. Dec. 142 (BIA 1977), for the
proposition that the regulation requires that the employer "must
establish the continuing ability to pay the combined proffered

wages to each beneficiary from the priority date of the instant petition."[15]  AR 40 (citing Great Wall, 16. I. & N. Dec. at 144-45).

---

[15] While Great Wall has been repeatedly embraced by the agency for the above-stated proposition, see, e.g., [Identifying Information Redacted by Agency], 2012 WL 9161264, at *6 (AAO Nov. 29, 2012), the agency's reasoning in the original administrative action is relatively thin.  Great Wall starts with the premise that Congress did not intend that a petitioner "who admittedly could not pay the offered wage at the time the petition was filed" should be eligible to have the petition approved.  16 I. & N. Dec. at 144-45.  In order to implement this congressional consideration, it then concludes that "the [agency] must consider the merits of the petitioner's job offer, so that a determination can be made whether the job offer is realistic and whether the wage offer can be met," which thus requires an examination of the "circumstances at the time of filing of the petition."  Id. at 145.  Such circumstances presumably include a determination of whether the employer could pay the wages of all the employees reported working at the site -- if not, then the offer would not be "realistic," and from that reasoning the agency appears to have drawn the proposition that the petitioner must be able "to pay the combined proffered wages to each beneficiary."  AR 40.  The agency does not, however, make that analytical step explicit.

Nevertheless, the Court adopts this interpretation.  Under the principle set out by the Supreme Court in Auer v. Robbins, 519 U.S. 452 (1997), an interpretation by an agency of its own regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'"  Id. at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)); see also Massachusetts v. Sebelius, 638 F.3d 24, 33-36 (1st Cir. 2011) (clarifying limitations of Auer deference).  Here, the regulation in question requires the employer to demonstrate an ability to pay the proffered wage.  It is not unreasonable to consider the employer's ability to pay its total wage obligations as part of an employee-specific inquiry.  Thus, because this Court cannot say that such an interpretation is either "plainly erroneous" or "inconsistent" with the regulatory text, it defers.

There are four ways the employer can establish its ability to pay.  "First, an employer can show that he is already employing the alien beneficiary at a wage equal to that specified in the Form ETA-750." Taco Especial v. Napolitano, 696 F. Supp. 2d 873, 878-79 (E.D. Mich. 2010) (citing USCIS Memorandum, Determination of Ability to Pay Under 8 C.F.R. 204.5(g)(2), (May 4, 2004)).  Second, the employer can establish "that its yearly net income exceeds the expected yearly wage specified in the [f]orm." Id. at 879.  Third, the "employer can show that its net current assets exceed the expected yearly wage." Id.  Finally, the agency has the discretion to consider other evidence, including whether the business has a "reasonable expectation of future profits sufficient to pay the proffered wage based on a totality of the circumstances." Id. (citing Matter of Sonegawa, 12 I. & N. Dec. 612 (BIA 1967)); see also Just Bagels Mfg., Inc. v. Mayorkas, 900 F. Supp. 2d. 363, 375 (S.D.N.Y. 2012) (noting that in "marginal or borderline" cases it is appropriate to consider the "overall magnitude of the entity's business activities") (quoting [Identifying Information Redacted by Agency], File No. LIN-06-277-50232, 2009 WL 1449670, at *5 (AAO Feb. 5, 2009)).

Turning back to the present case, the agency first looked at the wages Bombay Mahal had paid Patel. AR 39.  The agency declared that because the Form ETA-750 stated that Patel would

be paid $13.01 per hour for a work week of 35 hours, Patel would nneed to demonstrate income of at least $23,678.20 per year.  AR 39.  Patel provided W-2 forms indicating that he had been paid $9,450 in 2004, $24,050 in 2005, $24,137.94 in 2007, and $18,565.27 in 2008.[16]  AR 52-53, 56-57.  The AAO thus concluded that Bombay Mahal had not established that it paid the threshold wage in 2003, 2004, 2006, 2008, or 2009.  AR 40.  While this Court might quibble about whether to include all of 2003 in that calculation, since the priority date, and thus the date from which Patel had to be first paid, was April 4, 2003, it cannot hold that the conclusion that Bombay Mahal did not bear its burden of showing that it paid Patel the proffered wage in 2004, 2006, 2008, and 2009 was irrational.  This independently would be enough to justify revoking the petition.

The AAO next turned to the second and third grounds for proving ability to pay: yearly net income and net current assets for all sponsored I-140 petitions.  Here, the agency pointed to fifteen beneficiaries sponsored by Bombay Mahal and requested tax documentation from the restaurant to establish that wages were paid to all of those beneficiaries.  AR 40-41.  Bombay

---

[16] Patel submitted an IRS Form 1040, but not a W-2, in 2006, which reported that he had $29,380 in wage and salary income, although it did not indicate the source thereof.  AR 54.  The AAO did not accept the Form 1040 in lieu of the W-2 because "there is no evidence that the wages he received that year were from [Bombay Mahal]."  AR 40 n.8.

Mahal submitted its IRS Forms 1120S for 2003 through 2008, AR 62-108, which indicated the following:[17]

| Year | Net Income | Net Current Assets |
| --- | --- | --- |
| 2003 | $31,687 | -$748 |
| 2004 | $36,823 | -$8,882 |
| 2005 | $33,601 | -$28,581 |
| 2006 | $31,268 | -$18,109 |
| 2007 | $29,840 | $27,057 |
| 2008 | -$18,317 | $0 |

Looking at these figures, while they are sufficient (in most years) to pay Patel alone, they would not cover the additional sponsored workers employed at Bombay Mahal.  See AR 42. Finally, turning to the fourth method of demonstrating ability to pay, the fact that the restaurant went out of business suggests that the AAO need not have looked to see whether there was a "reasonable expectation of future profits" sufficient to

---

[17] Net income was calculated by looking at Schedule K of the IRS Form 1120S, which adjusts ordinary income "to account for additional income, credits, deductions or other adjustments." AR 41 n.10.  The AAO defines net current assets as "the difference between the petitioner's current assets and current liabilities; the current assets are shown on Schedule L, lines 1 through 6 and current liabilities are shown on lines 16 through 18."  AR 41 n.11.  Such a definition is commonly used in AAO decisions, and Patel does not challenge this method of calculation.  See, e.g., [Identifying Information Redacted by Agency], 2012 WL 9392067, at *4 (AAO June 8, 2012).

cover the wages in question.  See Taco Especial, 669 F. Supp. 2d. at 879.  Thus, because Bombay Mahal could not show its ability to pay Patel by using any of the four grounds that the AAO may consider, the agency was not irrational in revoking the petition on ability-to-pay grounds.

### 2.   Ability to Show Requisite Work Experience

In order to qualify for a skilled worker employment visa, a petitioner must demonstrate that the employee in question had the requisite job experience at the time the application was submitted.  Matter of Wing's Tea House, 16 I. & N. Dec. 158, 159-60 (BIA 1977); see also Viraj, LLC v. Holder, No. 2:12-CV-00127-RWS, 2013 WL 1943431, at *2 (N.D. Ga. May 8, 2013) (applying the Wing's Tea House standard).  The employee demonstrates compliance with this requirement as follows:

> Evidence relating to qualifying experience or training shall be in the form of letter(s) from current or former employer(s) or trainer(s) and shall include the name, address, and title of the writer, and a specific description of the duties performed by the alien or of the training received.  If such evidence is unavailable, other documentation relating to the alien's experience or training will be considered.

8 C.F.R. § 204.5(g)(1); see also id. § 204.5(l)(3)(ii)(A) ("Any requirements of training or experience for skilled workers, professionals, or other workers must be supported by letters from trainers or employers giving the name, address, and title

of the trainer or employer, and a description of the training received or the experience of the alien.").

Patel submitted two references to vouch for his qualifications.  First, he sent a letter dated April 30, 1998, and written by an employee of the Grand Hotel (Bombay), whose title was not identified, which stated that Patel "has been in our employment as a cook from April '95 to April 98 in [the] India and tandoori section."  AR 304.  Second, he submitted a letter dated March 9, 2009, which was written by Vasant K. Bhalekar, General Manager of the Grand Hotel (Bombay).  AR 220. This letter said that Patel "had been in our employment as a Tandoori and Curry (Indian Specialties) Cook from April 1995 to April 1998."  Id.  Additionally, on his Form ETA-750, Patel wrote that during his employment at the Grand Hotel (Bombay), he "cooked many styles of Indian foods for lunch and dinner, including tandoori style, curry, special vegetarian dishes, and non-vegetarian dishes, cold and hot appetizers and daily specials."  AR 161.

Patel's two letters are not sufficiently specific to satisfy the regulatory requirements detailed above.  The 1998 letter does not identify the title of his employer, nor does it describe Patel's specific duties beyond "a cook . . . in [the] India and tandoori section," which plausibly describes Patel's role or job title, but not his training or experience.  AR 304.

The 2009 letter does identify its author, but similarly only describes Patel's role; there is not a "specific description" of his duties as is required by the regulation.  While Patel's Form ETA-750 does sufficiently describe his duties, the regulations are clear that work experience documentation must be from an employer or trainer, rather than a self-affidavit.[18]  See 8 C.F.R. § 204.5(g)(1).  For that reason, while Patel criticizes the AAO for not interviewing him "to ask about his work experience and his job duties," Pls.' Mem. 16, such an interview, even had it occurred, would not satisfy the "documentation" requirement of the governing regulations.

Thus, given this evidence and framework, this Court cannot find that "the evidence presented would compel a reasonable finder of fact to reach a contrary result," and thus must affirm this independent ground for revocation.  Family Inc. v. United States Citizenship & Immigration Servs., 469 F.3d 1313, 1315 (9th Cir. 2006) (internal citation and quotation marks omitted).

### E.   Procedural Challenges

Patel raises three additional procedural arguments in favor of overturning the AAO's decision.  While one of these three

---

[18] The regulation does provide that "[i]f such [documentary letters are] unavailable, other documentation relating to the alien's experience or training will be considered."  8 C.F.R. § 204.5(g)(1).  Here, because the letters are available, though inadequate, the agency need not look to other evidence.

arguments has some merit, it is not sufficient to justify reversing the AAO's decision.

### 1.    Length of Time to Revoke Petition

First, Patel argues that the Government took an improperly long period of time to revoke his petition.  See Pls.' Mem. 13 ("[T]he passage of time from when the [USCIS] first took action to revoke the visa petition until the AAO requested other evidence from a dissolved corporation caused serious prejudice to Patel by inhibiting his and Bombay's ability to contest the agency's actions.").  This argument, however, is foreclosed by the statutory provision governing revocation, which provides that the Secretary of Homeland Security "may, at any time . . . revoke the approval of any petition."  8 U.S.C. § 1155.  "The statute permits revocation 'at any time,' so there plainly was no time constraint on when the agency could revoke the approval."  Herrera, 571 F.3d at 886.

Moreover, insomuch as Patel is making an implicit argument that the Government ought be estopped from arguing that no time limit applies, that argument, too, fails.  Estoppel against the federal government is generally disfavored, see Heckler v. Community Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 60 (1984), and in order to successfully bring a claim, the plaintiff must establish that:

(1) the government engaged in affirmative misconduct
going beyond mere negligence; (2) the government made
a knowing false representation or concealment of
material facts to a party ignorant of the facts with
the intention that the other party should rely on it;
and (3) the wrongful acts must cause a serious
injustice and the public's interest must not suffer
undue damage by the imposition of liability.

Perejoan-Palau v. United States Citizenship & Immigration

Servs., 684 F. Supp. 2d. 225, 231 (D.P.R. 2010).  Patel cannot

meet that standard -- at worst, the delay was the result of

negligence on the part of the Government (and there is no

indication of even that), and there is simply no evidence in the

record of affirmative misconduct or knowing false

representations on the part of the Government.[19]

### 2.   Notice

Second, Patel alleges that the USCIS did not provide proper

notice, as required both by regulation and statute.  Pls.' Mem.

12-13; see 5 U.S.C. § 555(e); 8 C.F.R. § 205.2.  Turning to the

first ground for terminating the petition, automatic revocation,

---

[19] In an effort to establish such misconduct, Patel seeks to
introduce a series of affidavits by immigration attorneys in the
Massachusetts area, which allege that the USCIS's action was
motivated solely by the fact that Patel's previous attorney, who
had been accused of misconduct, had been on the case.  See,
e.g., Aff. Attorney 2, ECF No. 33-1.  As evidence extrinsic to
the administrative record available to the agency at the time it
made its decision, this Court cannot consider such material
unless there is a "strong showing of bad faith or improper
behavior" on the part of the government or a "failure to explain
administrative action as to frustrate effective judicial
review."  Olsen, 414 F.3d at 155-56 (internal citations and
quotation marks omitted).  These affidavits do not satisfy
either criteria.

the regulation in question requires only <u>ex post</u> notification.

<u>See</u> 8 C.F.R. § 205.1(b) ("When it shall appear to the director

that the approval of a petition has been automatically revoked,

he or she shall cause a notice of such revocation . . . to be

mailed to the petitioner's last known address."). Here, it

appears that the AAO appeal which noticed such revocation was

sent to Bombay Mahal and Patel's attorney, thus satisfying the

notice requirement.[20]  <u>See</u> AR 32.

The second and third grounds -- ability to pay and ability

to show job qualifications -- are for-cause grounds requiring <u>ex</u>

<u>ante</u> notification.  <u>See</u> 8 C.F.R. § 103.2(b)(16); <u>id.</u> § 205.2(b).

Here, the agency sent notices addressing both points.  Turning

first to the ability to pay, the AAO's January 10, 2013, Request

For Evidence discussed in detail the need for Bombay Mahal to

provide evidence -- through W-2 documentation -- of payment of

the proffered wage to Patel.  AR 112.  The notice also pointed

to Bombay Mahal's additional I-140 beneficiaries and requested

tax records issued to each beneficiary in order to establish

whether the restaurant had the ability to pay the combined

---

[20] Moreover, though not required, the agency provided pre-termination notice to Bombay Mahal and Patel.  The November 1, 2012, Notice of Intent to Dismiss and Derogatory Information stated that the agency was planning to revoke the petition on the grounds that it "would be subject to automatic revocation due to the termination of [Bombay Mahal's] business."  AR 193.

proffered wage.  AR 112-113.  Such notice was sufficient and satisfies the relevant regulatory requirements.

The agency's job qualifications notice, however, was insufficient.  The February 18, 2009, Notice of Intent to Revoke expressed doubts about the reliability of Patel's employment verification letter and, quoting 8 C.F.R. section 204.5(g)(1), requested additional information.  AR 318.  In its appeal decision, the AAO concluded that this notice "neither provided nor referred to specific evidence or information relating to . . . [Patel]'s lack of qualifications in the present case."  AR 35. Such notice, the agency concluded, failed to comply with the rule set out in Matter of Arias, which provides that "where a notice of intention to revoke is based upon an unsupported statement . . . , revocation of the visa petition cannot be sustained."  19 I. & N. Dec. 568, 570 (BIA 1988).  Because the agency did not supplement this notice with an additional, more specific statement, this Court agrees with the AAO that such notice was inadequate, and thus would conclude that there was insufficient notice to justify revocation on this ground alone.

### 3.    Due Process Claim

Finally, Patel avers generally that he was "denied due process" during the appeals process, although he does not provide any context or explanation for this claim.  Compl. ¶

18.[21]  A court, however, may "consider the [Due Process Clause] only if the statute and regulations are deficient," and here the procedures in place are constitutionally adequate.  Portillo-Rendon v. Holder, 662 F.3d 815, 817 (7th Cir. 2011).  Even were they not, in order to bring a due process claim, a claimant must establish a "constitutionally protected property interest." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005).  There is no such property interest in an I-140 petition.  See, e.g., Smirnov v. Clinton, 806 F. Supp. 2d 1, 12 (D.D.C. 2011), aff'd, 487 F. App'x 582 (D.C. Cir. 2012)).  Therefore this claim must fail.

## III. CONCLUSION

For the aforementioned reasons, this Court GRANTS the Government's motion for summary judgment, ECF No. 22, and DENIES Patel's cross-motion for summary judgment, ECF No. 32.


**SO ORDERED.**



/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[21] The Complaint includes two paragraphs numbered as eighteen.  This citation refers to the second of those paragraphs.